# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KENNETH ALBERT, )
)
      Plaintiff, )
)
      vs. )
)
BANK OF AMERICA, N.A., *et al.*, )
)
      Defendants. )

No. 12 C 9785

Magistrate Judge Schenkier

## MEMORANDUM OPINION AND ORDER[1]

    This case arises out of an incident in which Plaintiff Kenneth Albert ("Plaintiff" or "Mr. Albert") was injured when a mirror lying on top of a dumpster at his condominium complex fell on his foot as he attempted to dispose of some discarded glass shelves. Mr. Albert originally filed a five count complaint in state court alleging negligence against Bank of America, NA ("Bank of America"), RE/MAX City View ("RE/MAX"), Prestige Management Solutions, LLC ("Prestige"), The Brookwood Condominium Association ("BCA"), and The Federal Home Loan Mortgage Corporation ("Freddie Mac") (doc. # 1: Notice of Removal, Ex. 1). On December 7, 2012, Freddie Mac removed the complaint to federal court (*Id.*). Mr. Albert subsequently amended the complaint to add defendants A&D Property and Services, Inc. ("A&D") and its owner, Ananias Granger ("Granger"), and Patmar Janitorial Service, Inc. ("Patmar") (doc. # 26: Second Am. Compl.). Pursuant to various motions and settlement agreements, Bank of America,

---

[1]On April 4, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 17).

RE/MAX, Granger and Freddie Mac are no longer defendants;[2] BCA, Prestige, A&D and Patmar remain in the case (doc. # 203: Third Amended Amended ("TAC")).

Before the Court is Prestige's motion for summary judgment (doc. # 233: Def. Mot. for SJ) as to Count I of Mr. Albert's Third Amended Complaint, which is the only count directed at Prestige.[3] Plaintiff has filed a response to the motion (doc. # 262: Pl. Resp. to Def. Mot. for SJ), and Prestige has filed a reply (doc. # 270: Def. Reply to Def. Mot. for SJ). Mr. Albert's central allegation against Prestige is that it was negligent in the way it maintained a dumpster area at the Brookwood condominium complex and that this negligence resulted in the creation of a dangerous condition (a mirror that was left on top of a dumpster) that caused Plaintiff a severe injury. In its motion for summary judgment, Prestige maintains that the material, undisputed facts show that it lacked notice of any dangerous condition and, as a result, it is entitled to judgment as a matter of law. For the reasons set forth below, Prestige's motion is granted.

## I.

The legal standards governing motions for summary judgment are well-established. Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the movant shows that there is an absence of evidence to support the nonmoving party's case, the nonmovant "must go

---

[2]Bank of America was dismissed on December 3, 2013 (doc. # 60); plaintiff dismissed Ananias Granger on July 9, 2014 (doc. # 169); Freddie Mac was dismissed from the case on September 14, 2014 (doc. # 175); and RE/MAX was dismissed on July 15, 2015 (doc. # 249).

[3]The counts directed at the other remaining defendants—BCA (Count II); Patmar (Count III); and A & D (Count IV)—are the subject of separate summary judgment motions by each of those defendants, which we decide today in separate rulings.

beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013) (internal citations and quotations omitted).

In deciding a motion for summary judgment, we "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen'l Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). We do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). That said, we are mindful that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## II.

In support of its motion, Prestige submitted a Rule 56.1 statement of material facts ("SOMF") (doc. # 235). Plaintiff responded to Prestige's SOMF (doc. # 263: Pl. Resp. to Def. SOMF) and submitted in that same document its own statement of additional undisputed facts ("SOAF"),[4] to which Prestige responded (doc. # 271: Def. Resp. to Pl. SOAF). We set forth in Part A the facts we find to be undisputed. We discuss in Part B the facts alleged in Plaintiff's SOAF that we find either immaterial to the case, contain improper legal conclusions, or are argumentative. "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements."

---

[4]Mr. Albert filed two largely identical documents, both of which purport to respond to Prestige's Local Rule 56.1 Statement of Undisputed Material Facts (docs. ## 259, 263). We discuss the details of this matter more fully in our ruling on BCA's motion for summary judgment. In this case, after finding no substantive difference between the documents for purposes of Prestige's motion for summary judgment, we cite only to document No. 263.

*Barkl v. Kaysun Corp.*, No. 10 C 2469, 2011 WL 4928996, at *1 n.2 (N.D. Ill. Oct. 13, 2011) (citing *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D. Ill. 2010)). "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010).

## A.

Mr. Albert was injured on July 21, 2011, when he was living in Unit 102 of The Brookwood Condominiums, 2650 Brookwood Way in Rolling Meadows, Illinois ("Brookwood" or the "Premises") (TAC, Count I, ¶ 1; Pl. Resp. to Def. SOMF ¶ 1). Taking place above Mr. Albert's own unit was a "trash out"[5] of Unit 202 (TAC, Count I, at ¶ 2). At the time of Mr. Albert's accident (approximately 8:00 p.m.), Mr. Albert carried glass shelves out to the dumpster area (Pl. Resp. to Def. SOMF at ¶¶ 10-11). He put the shelves on the ground before lifting the lid of one of the dumpsters to open it. When Mr. Albert lifted the lid, a mirror that was lying on top of the dumpster slid off onto his foot, cutting it (*Id.* at ¶¶ 11-12). Mr. Albert did not see the mirror before attempting to open the dumpster because its black backing blended in with the top of the dumpster (*Id.* at ¶ 13). Mr. Albert does not know who put the mirror on top of the dumpster, but he believes it was put there by a construction worker who was doing the Unit 202 trash out (*Id.* at ¶ 16). Mr. Albert does not know when the mirror was placed on top of the dumpster or how long it had been there by the time of his accident (*Id.* at ¶ 15).

BCA is the condominium association for the Premises (Pl. Resp. to Def. SOMF ¶ 2). Prestige is the property management company for the Premises (*Id.* at ¶ 3). BCA and Prestige

---

[5]As used by the parties, the term "trash out" means the act of a property maintenance company removing all non-garbage items and debris from an apartment that has been foreclosed so that it can be prepared for resale.

entered into the Brookwood Condominium Association Property Management Agreement (Pl. SOAF ¶ 1). That document identifies Prestige as BCA's agent in connection with managing the Premises's common areas, including the dumpster area (*Id.* at ¶¶ 1-2).[6]

Prior to and on the day of Mr. Albert's injury, Megan Klepitsch, owner of Prestige, acted as the Premises's property manager, and she visited the Premises periodically (Pl. Resp. to Def. SOMF ¶¶ 22-23). Ms. Klepitsch testified that once a month she inspected the Premises's common areas, which included the dumpster area, to make sure they were free of rubbish, debris and unsightly materials that were not placed in dumpsters (Pl. SOAF ¶¶ 2, 7). Ms. Klepitsch also testified that she "visualized" the dumpsters "maybe once a month" from her vehicle and one additional time per month during a walk-through (*Id.* at ¶ 10). Ms. Klepitsch stated that she was not present at the Premises on the day of Mr. Albert's injury and was not notified of any construction debris or mirrors deposited at the dumpster area on that day (Pl. Resp. to Def. SOMF ¶¶ 24, 26). Ms. Klepitsch stated that she did not believe that there were any problems with construction debris at the Premises (*Id.* at ¶ 25). Ms. Klepitsch does not know how long the mirror was on top of the dumpster or who put it there (*Id.* at ¶¶ 27-28).

Patmar is a janitorial service hired by BCA to clean the common areas at the Premises (Pl. Resp. to Def. SOMF ¶ 4). Alfranio Silva was the Patmar supervisor assigned to Brookwood during the time period that includes Mr. Albert's injury (*Id.* at ¶ 29). Mr. Silva testified at his

---

[6]We note that Prestige disagreed with Mr. Albert's SOAF ¶ 1 (which states that BCA and Prestige entered into an agreement "to manage certain common and limited common areas of the association") on several grounds, including that SOAF ¶ 1 failed to set forth the entire language of the Property Management Agreement. We have recast this statement to address the parties' differences. But at the same time, we reject Prestige's attempt in response to SOAF ¶ 1 to add facts and argument into the mix regarding the nature of the parties' relationship. *See Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 739 F.Supp.2d 1063, 1068 (N.D. Ill. 2010) ("the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses") (citation omitted).

deposition that he does not recall any problems with the dumpsters on the date of Mr. Albert's injury and does not remember having to call Ms. Klepitsch, or anyone associated with Prestige or BCA, regarding issues with the dumpster in the week or two prior to Mr. Albert's injury (*Id.* at ¶¶ 34-36).

Mr. Albert's wife at the time of the accident was Barbara Albert (Pl. Resp. to Def. SOMF ¶ 18). Ms. Albert does not know where the mirror on top of the dumpster originally came from or how long it was there prior to her husband's injury (*Id.* at ¶¶ 20-21). Ms. Albert testified that prior to her husband's accident, she observed bags, boxes, doors, and garbage on top of the dumpsters (Pl. SOAF at ¶ 22).

Bonnie Paul was the BCA president at the time of Mr. Albert's injury (Pl. Resp. to Def. SOMF ¶ 41). Ms. Paul stated at her deposition that she had never observed mirrors on top of the dumpsters, and that BCA was never aware of anyone placing mirrors or glass on top of the dumpsters prior to Mr. Albert's injury (*Id.* at ¶¶ 42-43). Ms. Paul further stated that she observed garbage on top of the dumpsters every five or six months (Pl. SOAF ¶ 34; Dep. of Bonnie Paul at 60-61).[7]

Suresh Babu was a BCA board member at the time of Mr. Albert's injury (Pl. Resp. to Def. SOMF ¶ 44). Mr. Babu did not personally contact Prestige about the dumpsters on the day of or during the two weeks leading up to Mr. Albert's injury, and he was unaware of anyone else doing so (*Id.* at ¶¶ 46-48). Mr. Babu (who moved to Brookwood in 1992) stated that he has never seen a mirror or large piece of glass on top of a dumpster (*Id.* at ¶ 49). He also stated that

---

[7]It is unclear from Ms. Paul's testimony exactly whether she observed garbage bags on top of the dumpsters with even that level of frequency. Although she first testified that she observed a bag on the dumpsters every five to six months, upon further questioning, Ms. Paul testified that, in the ten years leading up to Mr. Albert's accident, she observed garbage bags on top of the dumpsters a total of five to ten times (Dep. of Bonnie Paul at 61-62).

when "you would find something kept on top of the dumpster [it] would be because the dumpster could potentially be full" (Pl. SOAF ¶ 35).

Kenneth Albert testified that prior to his accident, he observed debris on top of the dumpsters "at times" (Pl. SOAF ¶ 25). He further testified that the dumpsters "were generally overloaded" and that when they got too full, "people toss stuff on top, some stuff on the sides" (*Id.* at ¶ 23). Between May 2011 and July 21, 2011, Brookwood resident Joseph Garvey stated that he observed items placed on top of the dumpsters, including furniture and garbage bags, approximately 12 times (*Id.* at ¶ 18). Between January 2011 and July 21, 2011, Brookwood resident Erik Janusz stated that he made four trips per week to the dumpster area and observed garbage on top of the dumpsters about 20-30 percent of the time, and between January 2009 and July 2011, he saw glass on top of the dumpsters four to five times (*Id.* at ¶¶ 19-20).[8] Mr. Janusz never reported this to Prestige (Dep. of Erik Janusz at 97).

## B.

Mr. Albert's SOAF contains 38 additional statements (Pl. SOAF at 9-12). Prestige responded to this filing by contesting, in whole or in part, every single statement on the bases that the statements were argumentative, immaterial, or inaccurate reflections of the record (Def. Resp. to Pl. SOAF). We have included 12 of these statements in part A above, except as noted in footnotes 6 through 8 above, and with only minor adjustments to harmonize the parties' differences (Pl. SOAF ¶¶ 1, 2, 7, 10, 18-20, 22-23, 25, 34-35). However, we find that the remainder of Mr. Albert's additional statements fail to pass muster as material facts.

---

[8]The parties dispute whether Mr. Janusz testified that he saw mirrors on top of the dumpsters or just "glass overall." The testimony is unclear but the Court finds that Mr. Janusz most consistently stated that he saw glass on top of the dumpsters and that it was Mr. Albert's attorney who repeatedly inserted the word "mirrors" into the follow-up questions he posed to Mr. Janusz (Dep. of Eric Janusz at 39-41). That said, whether Mr. Janusz saw mirrors or some other form of glass is immaterial to our ruling.

At the outset, we make a few observations about Local Rule 56.1. Local Rule 56.1(b)(3)(C) allows the non-movant (here, Mr. Albert) to submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." Only "material" facts should be included. Although neither Federal Rule of Civil Procedure 56 nor Local Rule 56.1 defines "material," the Seventh Circuit has recognized a "material" fact to be one that is a "potentially outcome determinative" fact. *See Jenkins v. Heintz*, 124 F.3d 824, 828 (7th Cir. 1997); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Additionally, legal arguments are not appropriately included in a Rule 56.1 statement. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement"); *Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 739 F. Supp. 2d 1063, 1068 (N.D. Ill. 2010) ("the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses") (citation omitted). We turn now to the additional facts that we reject for failure to comply with these standards under Local Rule 56.1.

*First*, we reject 10 statements because they involve the relationship between BCA and Prestige/Ms. Klepitsch (*See* Pl. SOAF ¶¶ 3, 4, 5, 6, 11, 12, 13, 14, 17, 33). We do not consider these statements to be material to the disposition of this case because this matter involves issues related to a breach of duty of reasonable care based on theories of actual or constructive notice of a dangerous condition. Whether BCA was displeased with Ms. Klepitsch's performance, or expected her to perform certain tasks, speaks to the relationship between BCA and Prestige,

8

which is not material to whether Prestige had actual or constructive notice of an alleged dangerous condition. *See National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.,* 98 F.3d 262, 264–265 (7th Cir. 1996) (citations omitted) (finding that it is the applicable law of the case that dictates which facts are material, and "[o]nly disputes that could affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

*Second,* we reject 10 other statements as immaterial because they are too general and have no close temporal connection with the facts of this case. Rule 56(e) provides that when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 922 (7th Cir. 1988) (citing *Celotex,* 477 U.S. 317, 323–25 (1986)). "[W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue, may not rest on its pleadings, but must affirmatively demonstrate by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County, REMC,* 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original).

Turning to Mr. Albert's statements, we find that the statement: "[i]n the first three months of 2011, Patmar notified Ms. Klepitsch about garbage accumulating on and around the dumpsters on several occasions" (Pl. SOAF ¶ 37), does little to shed light on what was happening at the dumpster area some three months later in July 2011. Similarly, the statement: "[Mr.] Albert spoke to Ms. Klepitsch at least ten to twelve times and asked her 'why [they were] still having problems with the dumpsters'" (*Id.* ¶ 29), likewise does not indicate when Mr. Albert spoke with Ms. Klepitsch in relation to the accident in July 2011 or with respect to what kind of problem. For example, it is possible that Mr. Albert wanted to speak with Ms. Klepitsch regarding rodents at the dumpsters, or unpleasant smells. The fact that Mr. Albert spoke with Ms. Klepitsch does

9

not give rise to the conclusion that they spoke about a dangerous condition of the sort Mr. Albert now asserts. The Plaintiff has not offered evidence that he told Ms. Klepitsch the "problems" were placement of dangerous items on top of dumpsters. The same lack of specificity plagues the statement: "[Mr.] Albert complained 'for years' to Brookwood board members and to its management group" (*Id.* ¶ 26; *see also* ¶¶ 8, 21, 24, 27-28, 30, 31, 32, 38). We find with respect to this group of factual allegations that Mr. Albert failed to support his statements with requisite specificity.

*Third*, we reject five statements because they are either legal arguments or contain argumentative language. For instance, the statement "Ms. Klepitsch did not actually visualize the dumpsters or the dumpster sheds very often," is argumentative in nature (Pl. SOAF ¶ 9). So too is the statement that the dumpster area was "poorly lit such that residents could not see there was garbage debris on the ground or on the dumpster lids" (*Id.* at ¶ 36; *see also* ¶¶ 6, 15, 16). Argumentative statements belong in briefs, not Local Rule 56.1 statements. *Pike v. Caldera*, 188 F.R.D. 519, 523 (S.D. Ind. 1999).

### III.

In Count I of Plaintiff's Third Amended Complaint, Mr. Albert alleges that Prestige "owed a duty to Plaintiff and others on the premises to use ordinary care in its control, management and maintenance of the premises including all common areas" (TAC, Count I, ¶ 13). This language suggests, along with the title of Count I of the Third Amended Complaint ("Negligence"), that Mr. Albert's claim against Prestige sounds in "general negligence." However, in their summary judgment papers, both Prestige and Mr. Albert treat the claim as one for premises liability. Prestige cites almost exclusively to cases that involve premises liability claims, and Mr. Albert discusses the well-settled principle that "a property owner has a duty to

keep common areas under its control in a reasonable safe condition (Pl. Resp. to Def. Mot. for SJ at 2-3). While the parties are entitled to frame the issues in their summary judgment papers as they see fit, we note that the parties jump directly into matters relevant to a breach of duty under premises liability law and skip over the question of whether an agent of a property owner can ever be held liable under a premises liability theory of negligence. Accordingly, for the sake of completeness and clarity, we pause to briefly touch upon that question.

## A.

"Whether a duty exists in a particular case is a question of law to be determined by the court." *Ward v. K Mart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990). Within the sweep of premises liability case law, Illinois courts have recognized the existence of a duty of care between landowners and persons present on a landowner's property. For example, landlords who lease property to tenants while maintaining control of common areas available to the tenants owe a duty of reasonable care to the tenants to keep those common areas reasonably safe. *Kucharis v. U.S.*, No. 93 C 1096, 1995 WL 151791, at *2 (N.D. Ill., Mar. 31, 1995); *Hiller v. Harsh*, 426 N.E.2d 960, 964 (Ill. App. Ct. 1981). A landlord's duty in this regard also extends to persons lawfully present on the premises. *Kostecki v. Pavlis*, 488 N.E.2d 644, 646 (Ill. App. Ct. 1986). Building owners also have a duty to correct dangerous conditions of which they know or reasonably should know. *Ohio Casualty Group v. Dietrich*, 285 F. Supp. 2d 1128, 1131 (N.D. Ill. 2003) (applying Illinois law). And, business owners owe their invitees a duty to maintain their premises in a reasonably safe condition to avoid injuring them. *Reid v. Kohl's Dept. Store, Inc.*, 545 F.3d 479, 481 (7th Cir. 2008) (applying Illinois law); *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057-58 (Ill. 2006).

With these principles in mind, we ruled separately today that BCA—as a condominium association that owned and controlled the Premises (including the common areas)—owed Mr. Albert, a resident of the Premises, a duty of reasonable care to maintain the common areas of the Premises in a reasonably safe manner. *See Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988). However, the same standard of care may not apply equally to Prestige.

Under an Illinois premises liability theory, it is essential that the defendant be in possession and control of the property on which the injury occurred. *See Escobar v. Coca-Cola Enterprises, Inc.*, 390 F. Supp. 2d 692, 695 (N.D. Ill. 2005) (finding that "Coca-Cola owed plaintiff a duty only if it 'possess[ed] and control[led] the . . . property on which the tort occurred'") (citing *Godee v. Ill. Youth Soccer Ass'n,* 764 N.E.2d 591, 594-95 (Ill. App. Ct. 2002)); *see also Williams v. Sebert Landscape Co.*, 946 N.D.2d 971, 974 (Ill. App. Ct. 2011) (finding that "[t]he concept of 'control' is closely tied with the ability to exclude people from the use of a piece of property or to direct how that property is to be used"). Here, we find no evidence that Prestige possessed or controlled the Premises. Prestige and BCA entered into the Brookwood Condominium Association Property Management Agreement ("Management Agreement") that designated Prestige as BCA's "Agent."[9] The Management Agreement states that Prestige, as Agent, was to operate and maintain the Premises "consistent with the overall policies and budget established by [BCA]."[10] Mr. Albert does not allege that Prestige was an

---

[9]"An 'agency' is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf." *Zahl v. Krupa*, 850 N.E.2d 304, 311 (Ill. App. Ct. 2006). "The existence and scope of an agency relationship are usually questions of fact to be decided by the trier of fact, unless the parties' relationship is so clear as to be undisputed." *Id.* In this case, Prestige and BCA entered into the Management Agreement identifying Prestige as the Agent of BCA (doc. # 263, Exh. A). The parties do not dispute this designation.

[10]The Management Agreement further states: "In the name of and behalf of [BCA], the Agent shall render services and perform all duties required to manage the Property in accordance with the standards set forth in [Paragraphs 2 and 3 (defining the Agent's duties)]" (Management Agreement, doc. # 263, Exh. A, ¶ 4).

owner of the Premises, or that it retained the control to exclude people from the Premises, or that it established and directed how the common areas were to be maintained and operated. As neither an owner nor controller of the Premises, it appears that Prestige is more properly subject to a claim of liability pursuant to an ordinary negligence standard, as opposed to a premises liability standard.

We look to *Simich v. Edgewater Beach Apartments Corp.*, 857 N.E.2d 934 (Ill. App. Ct. 2006), for support for this proposition. There, a condominium owner sued her condominium association and property manager, among others, for injuries sustained when she tripped over a hose. With respect to the property manager, the trial court instructed the jury using a premises liability theory, and the property manager appealed. On appeal, the court reversed, noting that "even if agency had been properly established, that does not lead to the use of premises liability instructions for the agent." *Id.* at 944. While the court cited no cases in support for its ruling, it reiterated that even if it were to assume the existence of an agency relationship, the property manager still would be liable for its own negligent acts, and thus the proper jury instruction arose under a general negligence standard. *Id.*; *see also Williams v. Sebert*, 946 N.E.2d 971, 974-75 (Ill. App. Ct. 2011) (contractor who had agreement with property owner for removal of snow was liable under ordinary negligence standard and not under the "heightened standard for an owner-occupier").

We note that Mr. Albert cites to the case of *Ahmed v. Pickwick*, 896 N.E.2d 854, 882 (Ill. App. Ct. 2008), which held that a property manager had a duty (based on its relationship with the property owner) to maintain the premises in a reasonably safe condition. However, the *Ahmed* court supported this conclusion with a citation to *Smolek v. K.W. Landscaping*, 639 N.E.2d 974, 977 (Ill. App. Ct. 1994), which stated only that a townhouse association (in other words, a

13

property owner) had a duty to maintain the common areas in a reasonably safe condition. The factual underpinnings of *Smolek* were thus quite different from those in *Ahmed*.

For these reasons, it appears that Plaintiff's allegations claim against Prestige are a questionable fit for a premises liability claim. That said, as both parties have forged ahead under a premises liability standard, we will do the same.

**B.**

We now turn to the question that is the focus of the motion: whether Prestige breached a duty to maintain the common areas in a reasonably safe condition. "Breach of this duty occurs when a landlord has actual or constructive knowledge of the existence of the defective condition and does not remedy it." *Kucharis*, 1995 WL 151791 at *4 (citing *Kostecki v. Pavlis*, 488 N.E.2d 644, 646 (Ill. App. Ct. 1986)); *see also Reid*, 545 F.3d at 481. To establish actual knowledge under Illinois law, the plaintiff must offer some evidence that the defendant was in fact aware of the condition. *Olivarius v. Tharaldson*, 695 F. Supp. 2d 824, 832 (N.D. Ill. 2010) (citing *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988), and *Tomczak v. Planetsphere, Inc.*, 735 N.E.2d 662, 667 (Ill. App. Ct. 2000)). Mr. Albert offers no evidence or argument indicating that Prestige had actual notice that the mirror that caused Mr. Albert's injury was atop the dumpster. This absence of evidence is fatal to Mr. Albert's ability to proceed on an actual notice theory.

Constructive notice of a dangerous condition under Illinois law can be established by means of two alternative theories: that "(1) the dangerous condition existed for a sufficient amount of time so that it would have been discovered by the exercise of ordinary care, or (2) the dangerous condition was part of a pattern of conduct or a recurring incident." *Culli*, 862 F.2d at 123. We address each form of constructive notice in turn.

**1.**

Prestige argues that Mr. Albert has offered no evidence from which any reasonable jury could conclude that Prestige had constructive knowledge of the specific alleged defective condition (the placement of a mirror on the dumpster) that caused Mr. Albert's injury (Def. Mot. for SJ at 5-13). We agree. Mr. Albert offers no evidence or argument from which a jury reasonably could conclude that the mirror rested atop the dumpster for a sufficient span of time before Mr. Albert allegedly encountered it such that Prestige should have known of its presence. As a result, Mr. Albert cannot proceed on a constructive notice theory based on the length of time the allegedly dangerous condition (the mirror atop the dumpster) existed before his injury. *See Reid*, 545 F.3d at 481-82 (finding that "unsupported speculation about the length of time the [dangerous] condition has existed is insufficient" to establish constructive notice).

**2.**

Prestige also argues that Mr. Albert has failed to offer evidence indicating that it had notice "regarding there being any issues with the dumpsters" or "evidence of any prior similar accidents" at the Premises—language we interpret to mean that Mr. Albert has not offered any evidence creating a triable issue of constructive notice based on a theory of a "pattern of conduct or a recurring incident" (Def. Mot. for SJ at 10-11; Def. Reply to Def. Mot. for SJ at 5). Prestige notes that "[t]he fact that bags of garbage are seen on top of garbage dumpsters at a dumpster corral is not surprising," and that "[t]he dumpster corral is where the garbage is intended to be and where it is placed" (Def. Reply to Def. Mot. for SJ at 5). Mr. Albert counters that "debris being placed atop the dumpsters was a regular occurrence," and that "all that is required to establish constructive notice is a pattern of dangerous conditions which [was] not remedied" (Pl. Resp. to Def. Mot. for SJ at 4-5). Mr. Albert focuses all of his attention on the assertion that

there is sufficient evidence from which a jury reasonably could impute constructive notice of a dangerous condition to Prestige because debris was regularly placed on top of the dumpsters and created a dangerous condition that Prestige failed to remedy (*Id.*).

Both parties discuss at length the case of *Culli v. Marathon Petroleum Co.*, 862 F.2d 119 (7th Cir. 1988), in which a customer sued a gas station for injuries sustained when she slipped and fell on a foreign substance in the pump area of the station. A jury found in favor of the plaintiff, and the defendant appealed. On appeal, the Seventh Circuit considered whether sufficient evidence existed to establish that the plaintiff's injury was caused by "a pattern of conduct or recurring incident which would constitute constructive notice of a dangerous condition." *Id.* at 125-26. In finding that such evidence did exist, the appeals court stated that the plaintiff did not need to show a pattern or practice of a particular type of spill; rather, the plaintiff needed only to show a pattern of dangerous conditions that were not remedied within a reasonable amount of time. *Id.* at 126. The Seventh Circuit cautioned that while property owners owe invitees "a duty to inspect and repair dangerous conditions on their property or give adequate warnings to prevent injury," they are not insurers of the invitees' safety. *Id.* at 123. But, on the facts of that case, the appeals court held that substantial evidence was presented at trial establishing that spills—whether oil or gas or otherwise—occurred on a daily basis in the pump area, and that the high number of sales made on the day in question (the gas station was also conducting a sale on soda and this brought in additional business on the day of the plaintiff's injury) made it unreasonable for the defendant to have swept and inspected the lot only at night.

Mr. Albert also cites to *Olivarius,* 695 F. Supp. 2d 824, in which a hotel guest sued an hotel after cutting her foot on a strip of carpet. The plaintiff alleged that the carpet at issue was wet and had been pulled away from the threshold to expose the fastening strip and the concrete

floor underneath. *Id.* at 833. The defendant moved for summary judgment, in part on the ground that the plaintiff lacked sufficient evidence to proceed under a theory of constructive notice. The court denied the motion, noting that while "a record devoid of problems similar to the dangerous condition alleged precludes this method of constructive notice," in that case there was evidence that hotel employees knew of frequent flooding and resulting complaints by guests of wet carpeting in their rooms. *Id.* at 834. Accordingly, the court found that a genuine issue of material fact existed as to whether the defendant had failed to properly clean the rooms and check for defective flooring that could result in an injury to a guest. *Id.*

Turning to this case, we disagree with Prestige's suggestion that Plaintiff must show that the alleged pattern of prior conditions was precisely the same (*i.e.*, mirrors placed atop the dumpster) as the condition that caused his injury. Dangerous conditions that are similar, although not identical, may be sufficient to create constructive notice. *See Culli*, 862 F.2d at 126 (finding that where spills were a daily occurrence at a gas station, a "particular type" of spill was not necessary to establish a pattern or a dangerous condition; for instance, only suntan lotion, or ice cream). However, we conclude that Mr. Albert has failed to demonstrate a genuine issue of material fact as to whether Prestige had constructive notice in July 2011 of a pattern of conduct or a recurring incident regarding dangerous items (mirrors or other kinds of debris) being placed on top of the dumpsters. Mr. Albert asserts that Erik Janusz observed glass or mirrors on top of the dumpsters four or five times between January and July 2011 (Pl. Resp. to Def. Mot. for SJ at 506), but this testimony does not create a genuine issue of material fact for several reasons.

*First*, Mr. Janusz actually testified that he observed glass or mirrors on top of dumpsters four or five times between January 2009 and July 2011—which is a span of two and a half years—as opposed to Mr. Albert's assertion that Mr. Janusz viewed the glass or mirrors over a

seven month period.  But regardless, Mr. Albert offers no evidence of how close in time any of those four to five incidents were in relation to his accident in July 2011.  *Second*, four to five occurrences over a period of more than two years is an insufficient basis upon which to infer a pattern:  recall that in *Culli*, the spills occurred on a daily basis, and in *Olivarius*, the flooring and resultant complaints were "frequent."  *Third*, Mr. Janusz admitted at his deposition that he never called Prestige to report any problem with the dumpster area (Dep. of Erik Janusz at 97).  Nor is there evidence of any prior injuries that were sustained as a result of any dangerous conditions at the dumpster area due to mirrors, from which notice to Prestige could be inferred.  *See Torres v. T.G.I. Friday's,* No. 05 C 45, 2006 WL 3743132 at *4 (N.D. Ill., Dec. 15, 2006) (plaintiff could not establish constructive notice by pattern or practice where the record was devoid of evidence regarding similar injuries caused by problems with lighting in fryer hoods at T.G.I. Friday's).

Moreover, we note that dumpsters and dumpster areas will naturally contain items that can cause injury.  The Premises's dumpster area was a place where residents (at any time of day or night) could dispose of household garbage and additional unwanted items that, quite possibly, were broken, sharp, heavy or dirty.  Even Mr. Albert considered the dumpster area to be a proper place to bring unwanted glass, as he was attempting to discard several panes of glass into a dumpster at the time of his injury.  *See Robinson v. Suitery, Ltd.,* 526 N.E.2d 566, 568 (Ill. App. Ct. 1988) (in a case brought under ordinary negligence, the court held that "[a]s a matter of common sense, people are presumed to know that dumpsters and other garbage receptacles may contain potentially harmful items with jagged or broken edges inside").

On this summary judgment record, we conclude that Mr. Albert has failed to offer evidence from which a jury reasonably could find that Prestige had constructive notice of a recurrent problem with dangerous items being placed on top of the dumpsters.

3.

Mr. Albert also argues that Prestige had constructive notice of a recurrent problem of what we call "general garbage" being disposed of in a dangerous fashion in the dumpster area. We find this argument to be without merit. Mr. Albert has presented evidence that the dumpster area may have been untidy; however, not all garbage, even messy garbage, is dangerous.[11] We are hard-pressed to see how a dangerous condition of which Prestige should have been aware can be crafted from the manner in which residents, collectively, dumped their unwanted garbage and other discarded items in the very place designated for their disposal, particularly in the absence of any evidence showing a history of recurring complaints of danger or evidence of prior injuries. *See Robinson* 526 N.E.2d at 568 (finding that the law does not require "extraordinary care" in the disposal of ordinary items such as broken glass and metal cans). Mr. Albert's evidence that the dumpster area was not always tidy does not create a triable issue as to whether the condition of the dumpster area presented a long-standing dangerous situation that Prestige should have known about and remedied. *See Olivarius*, 695 F. Supp. 2d at 834 (stating that "a record devoid of problems similar to the dangerous condition alleged" precludes constructive notice based on a pattern or conduct or recurring incident).

Nor does Mr. Albert offer evidence showing any alleged messy dumpster area conditions that were not attended to within a reasonable period of time. *See Culli*, 862 F.2d at 126 ("[w]hat

---

[11]Joseph Garvey testified that between May 2011 and Mr. Albert's injury in July 2011, he went to the dumpster area a dozen times and found it unclean and smelly, and that he saw garbage bags stored on top of the dumpsters and discarded items placed to the sides of the dumpsters, but that he never complained to "anyone at the building" about it (Dep. of Joseph Garvey at 28-33, 61, 65). Barbara Albert testified that she observed "a bit of everything out by those dumpsters" but that she never complained about it to Meghan Klepitsch at board meetings (Dep. of Barbara Albert at 80, 85-87). Bonnie Paul testified that she saw "[a]n occasional bag" every five or six months stored on top of a dumpster, but never something large like broken furniture, glass, or mirrors (Dep. of Bonnie Paul at 60-62). Suresh Babu testified that he saw garbage thrown on top of a dumpster maybe once in the ten times he has gone to the dumpster area (Dep. of Suresh Babu at 132). He stated that he was unaware of any dangerous conditions pertaining to the dumpster area prior to learning about Mr. Albert's lawsuit (*Id.* at 175).

is needed is a pattern of dangerous conditions which were not attended to within a reasonable period of time"). That the dumpster area was routinely filled with garbage and cast-offs is pretty par for the course: it was, after all, a place where people brought their garbage and unwanted items, and a place that contained upwards of eight individual dumpsters full of garbage awaiting off-site removal by a garbage removal service. To this latter point, we note that Waste Management Systems (which was not named as a defendant in this case) removed all of the garbage from the dumpster area three times a week—on Mondays, Wednesdays, and Fridays. Plaintiff offers no evidence that pick-ups three days a week were insufficient to handle the load of garbage in the dumpster area, or that pick-ups did not occur as scheduled. Mr. Albert simply offers no evidence suggesting that Prestige's response to the accumulation of garbage at the dumpster corral was inadequate. *See Shimkus v. Target Corp.*, No. 10 C 7066, 2012 WL 619500 (N.D. Ill. Feb. 24, 2012) (evidence of over 25 slip and fall incidents at Target store did not establish pattern of dangerous conditions where evidence failed to show that Target's response to such spills was inadequate).

Illinois law does not impose an absolute duty upon property owners to ensure the safety of its residents. *See Nichols v. Lowe's Home Center, Inc.*, 407 F. Supp. 2d 979, 981 (S.D. Ill. 2006) (stating the "[t]he defendant is not required to . . . make his premises injury-proof"). Rather, the law imposes a duty of reasonable care upon property owners to remedy dangerous situations of which they knew or should have known. While mindful that Mr. Albert suffered an unfortunate injury, we conclude that a reasonable jury simply could not find that Prestige breached a duty to Mr. Albert with respect to conditions at the dumpster area.[12]

---

[12]We find that a summary judgment ruling in Prestige's favor also would be unwarranted under general negligence principles. To recover on a negligence claim under Illinois law, a plaintiff must establish: 1) the existence of a duty of care owed by the defendant to the plaintiff; 2) a breach of that duty; and 3) an injury proximately caused by that breach. *Olivarius v. Tharaldson*, 695 F. Supp. 2d 824, 832 (N.D. Ill. 2010); *Marshall v.*

# CONCLUSION

For the foregoing reasons, we grant Prestige's motion for summary judgment (doc. # 233).

**ENTER:**

SIDNEY I. SCHENKIER
United States Magistrate Judge

**DATED:   February 9, 2016**

---

*Burger King Corp.,* 856 N.E.2d 1048, 1053 (Ill. App. Ct. 2006). Applying these factors to the case at hand, we conclude, based on the facts presented, that Prestige did not owe Mr. Albert a duty of care premised upon a claim of negligent disposal of garbage. "The factors for a court to consider in examining the existence of a duty include: the reasonable foreseeability of injury; the likelihood of injury; the magnitude of the burden to guard against it; and the consequences of placing blame on the defendant." *Herrera v. Target Corp.,* No. 07 C 2193, 2009 WL 3188054, at *3 (N.D. Ill., Sept. 30, 2009) (citing Illinois law); *see also Zimmerman v. Netemeyer,* 462 N.E.2d 502, 507 (Ill. App. Ct. 1984) (discussing that "foreseeability" enters into the negligence format only after the court has concluded that the defendant owed the plaintiff a duty of care and focusing instead on social policy considerations). We do not find Mr. Albert's injury to be reasonably foreseeable or likely: as with Mr. Albert, none of the defendants saw the mirror on top of the dumpster before it fell on Mr. Albert's foot, and thus no one, including Mr. Albert, was able to establish how long the mirror existed on top of the dumpster before it fell. Further, Mr. Albert has provided no evidence establishing earlier injuries at the dumpster area that were caused by falling glass or mirrors or discarded garbage of any kind—evidence that would bear upon foreseeability.

Policy considerations dictate against the imposition of a duty of care in this case. We draw support for this conclusion from *Robinson v. Suitery, Ltd.,* 526 N.E.2d 566 (Ill. App. Ct. 1988), which declined to find the existence of a duty of care in a case involving a claim of negligent disposal of garbage (there, a fluorescent lightbulb). The *Robinson* court noted that the glass that caused the plaintiff's hand injury ended up where it was supposed to be— "on or at the top of the garbage in the right dumpster." *Id.* at 568. The court also noted that "people are presumed to know that dumpsters and other garbage receptacles may contain potentially harmful items with jagged or broken edges inside." *Id.* The court stated that while the imposition of a "duty to dispose of garbage in a safe manner . . . . may be desirable as a general proposition," the court explained that the law does not impose such a duty in the disposal of normal waste materials (as opposed to weapons or toxic materials, for instance). *Id.* The court thus refused to hold the defendant responsible for the plaintiff's "inability to see down into the dumpster because of her height or the fact that she shifted garbage to make room for her trash." *Id.* at 569. We find this analysis applicable here and similarly conclude that Prestige did not owe Mr. Albert a duty of care relative to the disposal of garbage, including mirrors, at the dumpster area.