IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENNETH ALBERT,

    Plaintiff,

vs.

BANK OF AMERICA, N.A., *et al.*,

    Defendants.

No. 12 C 9785

Magistrate Judge Schenkier

## MEMORANDUM OPINION AND ORDER[1]

This case arises out of an incident in which Plaintiff Kenneth Albert ("Plaintiff" or "Mr. Albert") was injured when a mirror lying on top of a dumpster at his condominium complex fell on his foot as he attempted to dispose of some discarded glass shelves. Mr. Albert originally filed a five count complaint in state court alleging negligence against Bank of America, NA ("Bank of America"), RE/MAX City View ("RE/MAX"), Prestige Management Solutions, LLC ("Prestige"), The Brookwood Condominium Association ("BCA"), and The Federal Home Loan Mortgage Corporation ("Freddie Mac") (doc. # 1: Notice of Removal, Ex. 1). On December 7, 2012, Freddie Mac removed the complaint to federal court (*Id.*). Mr. Albert subsequently amended the complaint to add defendants A&D Property and Services, Inc. ("A&D") and its owner, Ananias Granger ("Granger"), and Patmar Janitorial Service, Inc. ("Patmar") (doc. # 26: Second Am. Compl.). Pursuant to various motions and settlement agreements, Bank of America,

---

[1] On April 4, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 17).

RE/MAX, Granger and Freddie Mac are no longer defendants;[2] BCA, Prestige, A&D and Patmar remain in the case (doc. # 203: Third Amended Complaint ("TAC")).

Before the Court is Patmar's motion for summary judgment as to Count III of the complaint (doc. # 242: Def. Mot. for SJ), which is the only one directed toward Patmar.[3] Plaintiff has filed a response to the motion (doc. # 260: Pl. Resp. to Mot. for SJ), and Patmar has filed a reply (doc. # 272: Def. Reply to Mot. for SJ). Mr. Albert's central allegation is that the defendants breached their various duties to keep the area where the dumpsters were stored (the "dumpster corral") safe and clean (TAC, Count III, ¶¶ 3, 4, 9).[4] Specifically as to Patmar, Plaintiff alleges that it had constructive knowledge that the dumpster corral and area around it was often overcrowded with garbage and debris that either did not fit or was not placed into the dumpsters (Id.). Plaintiff further alleges that, had Patmar been fulfilling its responsibility to keep the dumpster area safe and clean, it would have discovered and removed the mirror from the top of the dumpster before Mr. Albert's accident (Id.). Patmar argues that the material, undisputed facts show that Patmar lacked notice of any dangerous condition and, as a result, it is entitled to judgment as a matter of law. For the following reasons, the Court grants Patmar's motion for summary judgment.

---

[2]Bank of America was dismissed on December 3, 2013 (doc. # 60); plaintiff dismissed Ananias Granger on July 9, 2014 (doc. # 169); Freddie Mac was dismissed from the case on September 14, 2014 (doc. # 175); and RE/MAX was dismissed on July 15, 2015 (doc. # 249).

[3] The counts directed at the other remaining defendant – Prestige (Count I), BCA (Count II) and A&D (Count IV) - are the subject of separate summary judgment motions by each of those defendants, which we decide today in separate rulings.

[4]The area the parties refer to as the dumpster corral or dumpster shed is a covered wooden structure open on one of its long sides that was located behind the condominium complex. It has room underneath its roof to hold five dumpsters lined up side to side. The roof of the corral is high enough to allow a dumpster lid to be opened while the dumpster is underneath. As one of the photos used as a deposition exhibit depicts Prestige employee Megan Klepitsch standing at a dumpster and holding open the lid, we can infer that the dumpsters were approximately four feet high with the lid fully closed (doc. # 246: Patmar's 56.1 Statement, Ex. F (photos of dumpster corral)).

## I.

The legal standards governing motions for summary judgment are well-established. Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the movant shows that there is an absence of evidence to support the nonmoving party's case, the nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013) (internal citations and quotations omitted).

In deciding a motion for summary judgment, we "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen'l Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). We do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). That said, we are mindful that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## II.

In support of its motion, Patmar has submitted a Rule 56.1 statement of material undisputed facts ("SOMF") (doc. # 244). Plaintiff has responded to the SOMF (doc. # 261: Pl.

3

Resp. to SOMF) and has submitted its own statement of additional undisputed facts (doc. # 261: Pl. SOAF), to which Patmar has replied (doc. # 273: Def. Resp. to SOAF). "In determining what is disputed, we focus not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements." *Barkl v. Kaysun Corp.*, No. 10 C 2469, 2011 WL 4928996, at *1 n.2 (N.D. Ill. Oct. 13, 2011) (citing *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D. Ill. 2010)). "We review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). The following facts are undisputed unless otherwise noted by the Court.

At the time of Mr. Albert's accident, he lived in Unit 102 of the Brookwood Condominiums ("Brookwood" or the "Premises") in Rolling Meadows, Illinois (Pl. Resp. to SOMF ¶ 1). On July 21, 2011, at approximately 8:00 p.m., Mr. Albert carried three square glass shelves out to the dumpster corral (Pl. Resp. to SOMF ¶ 10). He put the shelves on the ground before lifting the lid of one of the dumpsters to open it. When Mr. Albert lifted the lid, a mirror that was lying on top of the dumpster slid off onto Mr. Albert's foot, cutting it (*Id.* at ¶ 12). Mr. Albert did not see the mirror before attempting to open the dumpster because its black backing blended in with the top of the dumpster (*Id.* at ¶ 13). Although Mr. Albert does not know who put the mirror on top of the dumpster, he believes it was put there by a construction worker who was doing some construction work on condominium unit 202 (*Id.* at ¶ 14). Mr. Albert does not know when the mirror was placed on top of the dumpster or how long it had been there by the time of his accident (*Id.* at ¶¶ 15, 16).

4

BCA hired Patmar in January 2011 to clean some of the building's common areas on a daily basis; a written agreement set forth Patmar's contractual obligations (Patmar's Resp. to SOAF ¶¶ 1, 2). Pursuant to the agreement, Patmar worked at Brookwood from 8:00 a.m. until 2:00 p.m. Monday through Friday, and from 8:00 a.m. until 9:00 a.m. on the weekends (Resp. to SOMF ¶ 24, Resp. to SOAF ¶ 19). The agreement specifically listed Patmar's duties as including, but not limited to:

- Emptying trash and recycling containers, changing liners as needed, and disposing garbage in the designated dumpsters (SOMF, Ex. B);

- Cleaning garbage rooms, rotating bins and taking out dumpsters for pick up (*Id.*);[5]

- Policing grounds doing garbage pick-up as Patmar staff moved from building to building (*Id.*).

During their depositions, Patmar owner, Felesbino Demengeon, and Patmar's supervisor for the Brookwood property, Alfranio Silva, described Patmar's responsibilities at Brookwood under the agreement as including:

- Taking dumpsters from the building out to the dumpster shed (SOAF ¶ 3);

- Inspecting the dumpster shed every day to make sure the dumpsters were maintained in a safe and clean condition (*Id.* at ¶¶ 4, 6); and

- Placing debris that was found outside, alongside, or on top of the dumpsters into the dumpsters (*Id.* at ¶¶ 5, 7).[6]

---

[5]"Rotating bins" referred to the process of taking a full dumpster from under the garbage chute in the garbage room, rolling it out to the dumpster shed for pickup by garbage company Waste Management, and putting an empty dumpster under the chute (SOMF, Ex. D at 30).

[6]Only Mr. Demengeon testified that Patmar's duties included putting debris found outside or on top of the dumpsters into the dumpsters. Mr. Silva, (who reported to Mr. Demengeon), testified that Patmar employees did not have a duty to put debris and garbage found alongside the dumpsters into the dumpsters and did not have a duty to notify their supervisors or Brookwood management about unsafe conditions (Resp. to SOAF ¶¶ 12, 13). This testimony is puzzling, as it appears contrary to Mr. Demengeon's testimony. But Mr. Silva's belief does not create a dispute of material fact that defeats summary judgment. There is no allegation (or evidence) that the onsite Patmar janitor did not adhere to the duties outlined in the contract or explained by Mr. Demengeon, and there is no evidence that the mirror was atop the dumpster at any time on July 21, 2011 when Patmar was at the Premises.

5

Mr. Demengeon explained Patmar's contractual duties to each Patmar employee assigned to a specific job site (Pl. Resp. to SOMF ¶ 21, Patmar's Resp. to SOAF ¶ 10). The Patmar employee assigned to Brookwood, who was the person who performed the daily work there, was named Edward Moscosa.[7] Mr. Silva checked in at Brookwood every one to two weeks for 30 minutes to make sure that "everything [was] being done" and to confirm that there were no complaints from either BCA or Prestige (SOMF, Ex. D at 28; Patmar's Resp. to SOAF ¶ 34). Patmar (through Mr. Moscosa) visited the dumpster corral twice a day as part of its cleaning process; Patmar's work generally did not require it to visit the corral after 12:00 p.m. during the week (*Id.* ¶¶ 22, 23).[8] Mr. Demengeon testified that on-site janitors were instructed to notify the management company if they observed unsafe conditions at Brookwood, such as debris on top of a dumpster (Patmar's Resp. to SOAF ¶ 9). Mr. Demengeon acknowledged that a mirror placed on the top cover of a dumpster could constitute a danger (*Id.* ¶ 11). Mr. Silva acknowledged that furniture piled alongside dumpsters as well as garbage bags or other garbage on top of the dumpsters could be a safety hazard (*Id.*).

There is no evidence that any Patmar employee knew that someone had placed a mirror on top of a dumpster on the day of the accident, and no Patmar employee reported seeing debris (from construction or otherwise) outside the Brookwood dumpsters in July 2011 (Pl. Resp. to SOMF ¶¶ 25, 27).[9] Mr. Demengeon testified that, if his employees were following their job

---

[7] Mr. Moscosa apparently moved out of the country prior to the filing of this lawsuit and was not deposed as part of discovery.

[8] Plaintiff notes in its response to the SOMF that Mr. Silva testified that at some point, Patmar had worked at Brookwood until 3:00 p.m. (Deposition of Mr. Silva at 65). That said, there is no evidence that Patmar was at Brookwood past 3:00 p.m. on the day of the accident, which occurred at 8:00 p.m.

[9] The parties quibble over minor details related to Patmar's lack of knowledge about the mirror. While Patmar says that "none of the Patmar employees knew that someone placed a mirror on top of the dumpster prior to Plaintiff's accident," Plaintiff clarifies that Mr. Silva testified only that he did not know who put the mirror on the dumpster on the date of the accident, and Mr. Demengeon testified that he did not receive phone calls from two

responsibilities, they would have contacted him if they had seen a mirror on top of a dumpster (*Id.* ¶ 26). During the first three months of 2011, Mr. Moscosa informed Mr. Demengeon twice about debris and furniture that was placed next to the dumpsters (Patmar's Resp. to SOAF ¶¶ 33, 34). Mr. Demengeon testified that he called Prestige employee Megan Klepitsch, the Brookwood property manager, to report the debris; he could not recall if he spoke to her or left a message (*Id.* ¶ 30, Pl. Resp. to SOMF ¶ 30). Ms. Klepitsch testified that she had never spoken to Mr. Demengeon; she was not asked if she ever received a message from him (Patmar's Resp. to SOAF ¶ 36). Mr. Albert testified that at some point, he had asked Patmar's "onsite person" if the building was having problems with the dumpsters or if that person knew when pick up was (*Id.* ¶ 30).[10]

BCA president Bonnie Paul testified that she had seen garbage bags -- but no furniture, glass or mirrors -- on top of the dumpsters in the ten years prior to Mr. Albert's accident (Pl. Resp. to SOMF ¶¶ 33, 34).[11] Ms. Paul had no knowledge of anyone ever putting glass on top of the dumpsters (*Id.* ¶ 35). Brookwood resident Joseph Garvey observed furniture or garbage bags placed on top of dumpsters at least a dozen separate times between May 2011 and July 21, 2011 (Patmar's Resp. to SOAF ¶ 19). Another resident, Eric Janusz, disposed of garbage in the dumpsters approximately four times per week at different times during the day, and saw glass or

---

specific Patmar employees (Mr. Silva and Mr. Moscosa) about debris outside the Brookwood dumpsters in July 2011. Such minor disputes about details do not create a genuine dispute of material fact about whether Patmar had actual knowledge of a mirror atop the dumpster on the day of the accident; Plaintiff offers no evidence that Patmar had such knowledge.

[10] Waste Management was responsible for emptying the dumpsters stored at the dumpster corral and hauling away the garbage (Deposition of Bonnie Paul at 144). Waste Management visited Brookwood three times per week, on Monday, Wednesday and Friday (*Id.*). The company was not made a defendant in this case and none of its employees were deposed during discovery.

[11] It is unclear from Ms. Paul's testimony exactly how often she observed garbage bags on top of the dumpsters. At one point, she says she observed a bag on the dumpsters every five to six months (Deposition of Bonnie Paul at 60). However, upon further questioning, Ms. Paul testified that, in the ten years leading up to Mr. Albert's accident, she observed garbage bags on top of the dumpsters a total of five to ten times (*Id.* at 61-62).

7

mirrors on top of dumpsters four or five times during the 30 months between January 2009 and July 2011 (*Id.* ¶¶ 20, 21, 22, Pl. Resp. to SOMF, Ex. F at 37, 40).[12] He testified that he saw garbage, which sometimes included construction debris, cabinets, televisions and glass on top of the dumpsters between 20 and 30 percent of the times he visited the dumpsters in the seven months leading up to Mr. Albert's accident (Patmar's Resp. to SOAF ¶¶ 21, 22). Other than testifying that he saw glass on top of the dumpsters four or five times in a two-and-one-half year period, Mr. Janusz did not testify about how often he saw specific types of garbage (i.e., soft garbage bags versus a piece of furniture) on top of the dumpsters during that time.

Both the Plaintiff and his wife also testified about the condition of the dumpsters prior to the accident. Mr. Albert testified that prior to his accident, the dumpsters were "generally overloaded," which led people to place "stuff" on top or on the sides of the dumpsters (*Id.* ¶ 27). Barbara Albert testified that prior to the accident, she saw bags, boxes, closet doors, and other garbage on top of the dumpsters (*Id.* ¶ 26).

### III.

In an action for negligence, a plaintiff must show the existence of a duty on the part of the defendant, a breach of that duty, and an injury caused by the breach. *Vesey v. Chicago Housing Authority*, 583 N.E.2d 538, 541 (Ill. Sup. Ct.1991), *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1053-54 (Ill. Sup. Ct. 2006). "[T]he touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall*, 856 N.E.2d at 1057. Absent Patmar owing a duty toward Plaintiff, there can be no

---

[12]The parties both characterize Mr. Janusz' testimony about seeing glass on top of the dumpsters four or five times as referring to the period between January and July 2011. However, according to Mr. Janusz' deposition testimony, he observed glass on top of dumpsters three to four times between January 2009 and January 2011 and a single additional time between January and July 2011 (Pl. Resp. to SOMF, Ex. F at 37, 40).

8

finding of negligence. Yet, the parties leap past the threshold element of the existence of a duty, and focus on whether the summary judgment record shows a triable issue on the question of whether Patmar breached a duty to Mr. Albert because it had constructive notice of a dangerous condition at the dumpster corral but failed to remedy such condition.

The parties' approach is not entirely surprising. The Illinois Supreme Court has stated that "the concept of duty in negligence cases is very involved, complex and indeed nebulous." *Marshall*, 856 N.E.2d at 1057, *cited by Olivarius v. Tharaldson Property Management, Inc.*, 695 F.Supp.2d 824, 831 (N.D. Ill. 2010). The *Olivarius* court commented that "[c]ourts have a tendency to conflate the duty and breach elements." *Olivarius*, 695 F.Supp.2d at 831. As we explain below, that is what the parties have done here. Patmar argues that it did not have a duty to Mr. Albert because there is no evidence that Patmar either put the mirror on the dumpster or had actual or constructive notice that it was there. Mr. Albert agrees there is no evidence that Patmar created the hazardous condition or had actual knowledge that the mirror was on top of the dumpster. Instead, Mr. Albert argues that Patmar is liable for his injury because the mirror on top of the dumpster was part of a recurring condition of dangerous debris on and around the dumpsters, that this general accumulation of debris put Patmar on constructive notice that the corral area constituted a hazard, and that Patmar's failure to address this hazard breached a duty toward Mr. Albert.

We discuss briefly the question of duty before we turn to the parties' arguments regarding constructive notice.

### A.

Whether a defendant owes the plaintiff a duty is a question of law. *Ward v. K Mart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990). While Plaintiff argues that Patmar breached its duty to keep the

dumpster corral clean and safe, he fails to show that Patmar's duty – if it even had one – was a duty to him or any of the other residents at Brookwood. The sole case Plaintiff cites to establish that Patmar had a duty to the Brookwood residents -- *Ahmed v. Pickwick Place Owners Assn.*, 896 N.E.2d 854, 863 (Ill. App. Ct. 2008) (Pl. Resp. to Mot. for SJ at 3) -- concerns a management company's duty to keep the common areas of an apartment complex over which it exercised control in a reasonably safe condition. But unlike the management company in *Ahmed*, Patmar did not exercise control over any of the Brookwood common areas; rather, it was hired by BCA to clean some of those common areas. We have found no case law establishing a duty to individual tenants under such circumstances; the law we have found indicates that a party such as Patmar does not owe a duty to any individual tenant. *See Lewis v. W.F. Smith & Co.*, 390 N.E.2d 39, 43 (Ill. App. Ct. 1979) (where apartment tenant slipped on icy steps, court noted that any duty owed by janitor tasked with clearing steps was to his employer, not tenant).

Absent evidence that Patmar owed a duty toward Mr. Albert, Patmar's alleged missteps cannot constitute a breach. *Wade v. Wal-Mart Stores, Inc.*, 39 N.E.3d 1141, 1143 (Ill. App. Ct. 2015). Our inquiry cannot end here, however, because Patmar did not raise lack of a duty to Mr. Albert as an independent basis for summary judgment. We will not grant Patmar summary judgment on a ground it did not raise and that Mr. Albert thus had no reason to brief. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision"). However, we have no need to invite briefing on this point, as the evidence and case law on the issue the parties did choose to address – constructive notice – demonstrates that Patmar is entitled to summary judgment.

**B.**

Plaintiff offers no evidence that Patmar placed the mirror that injured him on the dumpster, or knew that the mirror (or any other arguably dangerous condition) was present on the dumpster on the evening of July 21, 2011. Instead, Mr. Albert proceeds on a theory of constructive notice of a dangerous condition, which in Illinois may be established under two alternative theories: "(1) the dangerous condition existed for a sufficient amount of time so that it would have been discovered by the exercise of ordinary care, or (2) the dangerous condition was part of a pattern of conduct or a recurring incident." *Culli v. Marathon Petroleum Co.*, 862 F.2d 119, 123 (7th Cir. 1988) (internal citations omitted). Plaintiff impliedly concedes that Patmar cannot be liable under the "sufficient time" theory by limiting his argument to the second theory of constructive notice: that the presence of a dangerous condition at the dumpster was a recurring incident that Patmar should have known about but failed to take action to remedy (Pl. Resp. to Mot. for SJ at 3-4).

At the threshold, we note that constructive notice generally arises under a theory of premises liability, not ordinary negligence. *See, e.g., Olivarius*, 695 F.Supp.2d at 832 ("[c]ourts applying Illinois law analyze a business owner's actual or constructive notice of a dangerous condition as a fact issue . . ."); *Culli v. Marathon Petroleum Co.* 862 F.2d 119 (7th Cir. 1988) (defendant property owners could be liable for slip and fall if they had actual or constructive notice of dangerous condition on their property and failed to repair it). While we have found an Illinois case applying a constructive notice theory to a non-premises-owner janitorial company, the case concerned only the question of whether the hazardous condition had existed for a sufficient time that the janitorial company should have discovered it, and did not even mention the "recurring incident" aspect of constructive notice. *Catchot v. Macerich Management Co.*, No.

11

1-13-2111, 2014 WL 1757938 (Ill. App. Ct., April 28, 2014) (janitorial company not liable for plaintiff's slip and fall in a shopping mall where no evidence indicated how long puddle of water had been on floor prior to fall and evidence showed janitor had inspected floor within 30 minutes prior to fall). However, even if we apply the "recurring incident" theory of constructive notice to a defendant such as Patmar, the evidence in the summary judgment record shows that Plaintiff has failed to create a triable issue on the question of whether Patmar had constructive notice here.

The "recurring incident" theory of constructive notice requires a showing that the dangerous condition was "part of a pattern of conduct or a recurring incident," which the defendant failed to remedy. *Dunlap v. Marshall Field & Company,* 327 N.E.2d 16, 19 (Ill. App. Ct.1975); *Culli,* 862 F.2d at 123. Plaintiff argues that testimony by several residents of Brookwood that they observed garbage and other debris on top of and next to the dumpsters in the years and months prior to Mr. Albert's accident established a pattern of recurring conduct – a dangerously messy dumpster area (Pl. Resp. to Mot. for S.J. at 8). Furthermore, argues plaintiff, Patmar's responsibilities at Brookwood must have made it aware of the accumulation of debris, but Patmar took no action to remedy the situation (*Id.*). For the following reasons, Plaintiff's evidence is insufficient to permit a reasonable jury to find that Patmar had constructive notice of a dangerous condition at the dumpster corral.

*First*, despite testimony that the dumpster area tended to accumulate trash, construction debris, household items and other garbage on top of and around the dumpsters, there is no evidence that this trash accumulation happened during the limited times that Patmar was onsite at Brookwood or the even more limited times that its duties brought its employees to the dumpster corral area. Patmar cannot be tasked with notice of or responsibility for debris and garbage at the

dumpster corral that was placed there after its work day ended. To put it another way, given the limited scope and timing of Patmar's duties at Brookwood, even assuming that Patmar completely fulfilled those cleaning duties on the date of the accident (including putting any debris it found on top of or around the dumpsters into the dumpsters), Mr. Albert would still have been injured by the falling mirror if it was placed there after Patmar left the property. And, there is no evidence that would allow a jury to reasonably find that the mirror was atop the dumpster prior to Patmar leaving the premises by no later than 3:00 p.m. on July 21.

More generally, the testimony does not establish that garbage and debris accumulation occurred solely (or even primarily) during Patmar's work hours. The testimony concerning the dumpster corral covered a several year period, during which some residents observed garbage on top of dumpsters. Only one resident testified even generally about the times of day he observed such debris, and only some of those times overlapped with Patmar's work hours.[13] Additionally, there is no evidence concerning the length of time such debris remained at the dumpster corral before being removed by Waste Management during one of its thrice weekly visits. Because the summary judgment evidence will not allow a jury to reasonably find that the accumulations occurred during Patmar's working hours, an inference of constructive notice is improper.

*Second*, Seventh Circuit case law interpreting the constructive notice theory requires "a pattern of dangerous conditions that were not remedied within a reasonable amount of time." *Culli*, 862 F.2d at 126. That is, Mr. Albert must not only provide evidence of a pattern of garbage and other debris accumulation in the dumpster corral, but he must also offer evidence to show a

---

[13]Plaintiff puts considerable emphasis on the testimony of Mr. Janusz, who observed debris (which apparently was anything from ordinary trash bags to small appliances) on top of dumpsters 20-30 percent of the time he visited them, and who testified that on one occasion, a glass shower door almost fell on his foot, as proof that the dumpsters had a constant debris problem of which Patmar should have been aware. But Mr. Janusz admitted that the incident with the shower door happened at night, many hours after Patmar was no longer at the Brookwood premises.

negligent response to a dangerous condition caused by garbage or debris. *See Shimkus v. Target Corp.*, No. 10 C 7066, 2012 WL 619500 (N.D. Ill. Feb. 24, 2012) (evidence of more than 25 slip and fall incidents at Target store did not establish pattern of dangerous conditions where there was no evidence that Target's response to such spills was inadequate). Indeed, in this case the alleged danger is less obvious than customers regularly slipping on the floor in *Shimkus*. In fact, unlike in *Shimkus*, there is no evidence that any other individual was ever injured by the conditions at the dumpster corral, and thus, we do not even need to address the *Shimkus* question of whether Patmar's response to earlier injuries was adequate or not. And with respect to Mr. Albert's specific injury, the summary judgment record does not establish that Patmar failed to clear garbage and debris that may have accumulated at the dumpster corral during its watch.[14]

Finally, Mr. Albert attempts to demonstrate constructive notice from Mr. Demengeon's and Mr. Silva's acknowledgement that glass or debris on top of dumpsters could be a safety concern. However, this general recognition does not create a question of fact about whether Patmar had constructive notice that there actually was a recurring dangerous condition at the dumpster corral. As we explain above, no evidence establishes that garbage and debris accumulated in the dumpster corral specifically during Patmar's work hours. Therefore, a general recognition by Patmar that glass on top of a dumpster could be dangerous is insufficient to allow

---

[14]We recognize that Mr. Silva testified that it was not the responsibility of Patmar employees to put debris found in the dumpster corral into the dumpsters or to report the accumulation of debris to Brookwood management. However, Mr. Silva's testimony about what he believed Patmar's duties to be is not evidence of what Patmar employees actually did while on the job. Mr. Silva was not the Patmar employee who actually performed cleaning work under the agreement with BCA, and Mr. Silva agreed at his deposition that if Patmar owner Mr. Demengeon testified differently with respect to Patmar's duties at Brookwood, Mr. Demengeon's testimony would control because he was the owner (Deposition of Mr. Silva at 66-67).

a reasonable jury to infer that Patmar must have known that the dumpster corral presented a danger.[15]

Constructive notice is also not created by the fact that on two occasions in the seven months leading up to Mr. Albert's accident, a Patmar janitor informed Mr. Demengeon about a microwave oven and furniture in front of the dumpsters. Mr. Albert argues that this proves Patmar knew that garbage accumulated in front of the dumpsters and yet, did nothing about it. Even assuming that Patmar did not inform Prestige about the furniture in the dumpster corral, two incidents of debris in front of (not on) the dumpsters is not sufficient to demonstrate a recurrent pattern of dangerous debris accumulation or that Patmar's response to these items was so inadequate as to constitute a negligent response to a dangerous condition. Indeed, a microwave or other furniture on the ground in front of a dumpster does not implicate the same type of possible danger posed by a dark mirror on top of a dark dumpster. At most, Patmar knew that tenants sometimes put small appliances or furniture in front of the dumpsters, not that garbage or other debris accumulated on top of the dumpsters at a rate that threatened the safety of the residents.[16]

We are sympathetic to Mr. Albert for the serious injury he suffered. But to the extent that Mr. Albert would ask a jury to infer negligence on the part of Patmar by the mere fact of his

---

[15] Nor is evidence of alleged accumulations of debris and garbage sufficient to allow a jury to reasonably conclude that this created a dangerous condition. Dumpsters and dumpster corrals will naturally contain items that can cause injury, and Brookwood's dumpster area was a place where residents (at any time of day or night) were allowed to dispose of household garbage and additional unwanted items that, quite possibly, were broken, sharp, heavy, or dirty. *See Robinson v. Suitery, Ltd.*, 526 N.E.2d 566, 568 (Ill. App. Ct. 1988) (in a case brought under an ordinary negligence theory, the court held that "[a]s a matter of common sense, people are presumed to know that dumpsters and other garbage receptacles may contain potentially harmful items with jagged or broken edges inside"). Not all garbage, even messy garbage, is dangerous.

[16] BCA President Bonnie Paul testified that residents were actually expected and allowed to put construction and other debris into the dumpster corral area (Deposition of Bonnie Paul at 118).

injury, such an inference is improper under longstanding Illinois tort law. *Kellman v. Twin Orchard Country Club*, 560 N.E.2d 888 (Ill. App. Ct. 1990).

## CONCLUSION

For the foregoing reasons, we grant defendant Patmar's motion for summary judgment (doc. # 242). It is so ordered.

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED:  February 9, 2016